# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

KRISTEN CARLSON,

      Plaintiff,

    v.                                         Civ. No. 10-1195- JCH/RHS

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,

      Defendant.


## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant Board of Education of the Albuquerque Public Schools's (hereinafter, "Defendant's" or "APS's") *Motion for Summary Judgment* (Doc. 37). Plaintiff Kirsten Carlson, an occupational therapist employed by Defendant during the 2009-1010 school year, contends that Defendant failed to renew her employment contract in retaliation for her repeated complaints about her colleagues' failure to comply with federal standards for the appropriate education of students with disabilities, and for otherwise advocating for the rights of disabled students, in violation of Section 504 of the Rehabilitation Act of 1973 and the New Mexico Whistleblower Protection Act, NMSA 2012 § 10-16C-1, et seq. On the instant motion, Defendant argues that it was free to terminate Plaintiff, a non-tenured employee, for any reason it deemed sufficient, and that it in fact had legitimate, non-discriminatory reasons for doing so. The Court, having considered the motion, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that Defendant's motion should be denied**.**

## FACTUAL BACKGROUND

### Plaintiff's Hiring and Credentials

Plaintiff was hired by Defendant to work as an occupational therapist for the 2009-2010 school year, and was initially assigned to work at various schools in Albuquerque, including Atrisco Elementary School.  The parties do not dispute that Plaintiff is a skilled occupational therapist who had a Ph.D. and more than 10 years of professional experience at the time of the events described herein.

### Complaints From Co-Workers

On January 27, 2010, two of Plaintiff's co-workers at Atrisco Elementary submitted letters to Defendant describing their negative experiences working with Plaintiff.  These letters appear to have been solicited by Frank Fast-Wolf, a Program Support Specialist for APS, as a means of memorializing previously-voiced complaints.  Robert Warr, a teacher who worked with Plaintiff in the Intensive Support Program ("ISP")[1] at Atrisco Elementary, complained that Plaintiff had come into his classroom and taken over his "circle time"; re-written a disabled student's Individualized Education Program ("IEP"); tried to assume control of IEP meetings they both attended; and examined the inside of his classroom cabinets without his permission.  Warr further noted that Plaintiff would make him and his Educational Assistants "feel like we don't know how to do our jobs. . . . She would talk down to us and tell us what we should be doing.  She has good suggestions but tells them to us in a way that makes you feel like you do

---

[1]The Amended Complaint quotes an APS handbook as describing its Intensive Support Programs as "'designed to provide the intensity of supports that many students with severe disabilities require in order to develop vital skills.'" (Doc. 13, First Amended Cplt. ¶ 12, quoting *Handbook for Teachers of Students with Severe Disabilities in Albuquerque Public Schools* at 3 (March 29, 2004 - APS Instructional Supports Task Force)).

not know what you are doing." (Doc. 37 Ex. A). Another teacher, Stephanie Johnson, described

Plaintiff as "rude and condescending," and insistent on receiving a report on a student from an

outside professional that Johnson claimed did not concern her. *Id.* Johnson noted that other staff

members were "concern[ed] . . . that [Plaintiff] makes suggestions and is unwilling to entertain

their opinions of what has been working." *Id.*

The same day, Irene Duran, an IEP Specialist at Atrisco Elementary, in an email to Fast-

Wolf, briefly noted a disagreement she had recently had with Plaintiff, whom Duran had asked

"not to keep talking after we have made a consensus [at a meeting] as to what we [were] trying

to write down on the IEP. So you might get another complaint about me from her." *Id.*

On February 1, 2010, Audie Brown, Principal of Atrisco Elementary, sent a letter to Fast-

Wolf with the purpose, "per our discussion," of informing him of his experiences working with

Plaintiff. Brown described Plaintiff as a "very knowledgeable and intelligent" new employee,

but noted that the teachers in the ISP Program had shared concerns about her, ranging from her

"making them feel as though they are incompetent[,] to her talking about teachers to others,"

taking a leading role at IEP meetings, and speaking privately about disabled students with their

parents. *Id.* Brown noted that he had met with ISP staff including Plaintiff on several occasions,

and the situation continued to be "uncomfortable and tense." *Id.*

The same day, Stephani Treadwell, Head Special Education Teacher at Atrisco,

submitted a letter noting that Plaintiff "was hired to be the OT for our students and shows a lot of

skill in this capacity[,] but has not been able to get along with the adults." *Id.* Treadwell noted

that she had met individually with Plaintiff, her supervisors and the EAP group, and that "[s]ome

other alternative is needed." *Id.*

3

## The J.M. Incident; Plaintiff's Suspension and Reassignment

On February 10, 2010, Defendant placed Plaintiff on administrative leave pending an investigation by APS police into Plaintiff's alleged pinching of J.M., a disabled student, during an occupational therapy session.  Plaintiff vigorously disputes the legitimacy of the underlying allegation, notes that various versions of who originally reported the incident exist, and contends that the physical therapist who purportedly made the original complaint actually informed an APS police detective that Plaintiff "was not being malicious [in squeezing J.M.'s muscle] but was rather trying to relieve muscle constriction the child was experiencing."  (Doc. 41 Ex. 5).  Plaintiff does not specifically dispute that J.M. started to cry after being touched by Plaintiff.

The Investigation Report prepared by APS police found, *inter alia*: that Audie Brown had spoken to Plaintiff about "improperly involving herself in school matters that were none of her concern"; that Plaintiff conceded that she might have written a comment into a student's IEP that the student required access to a computer without the approval of other IEP team members; and that Plaintiff had been advised by her supervisors that she exceeded the scope of her duties by making "complaints about other staff using a device called a lifting chair in an inappropriate, and what she termed, an unlawful manner."  (Doc. 37 Ex. D).  With respect to the purported reason for the investigation – Plaintiff's alleged pinching of J.M. –  the Report noted Plaintiff's explanation that she was merely applying muscle-relief techniques to J.M.'s legs, which was supported by a physical therapist who had witnessed Plaintiff apply the same techniques on other occasions, with no harm observed.  (Doc. 41 Ex. 5).  The Report further noted Head Special Education Teacher Stephani Treadwell's opinion that, regardless of whether or not the action was therapeutic, "making a child cry is not what is supposed to happen in any APS classroom." *Id.*

4

Plaintiff was permitted to return to work on February 18, 2010, and was reassigned to a different group of schools within APS.

**Plaintiff's Written Complaint About Treadwell**

Also on February 18, 2010, Stephani Treadwell wrote to Frank Fast-Wolf about what she termed a "misconception" made by Plaintiff, pursuant to which Plaintiff added to a student's IEP that the student was "not being served legally. . . . I am not thrilled that she is putting in writing to everyone in the district that I am not legally serving my students according to their IEPs.  I will deal with this administratively."  (Doc. 41 Ex. 9).

**Due Process Hearing and Suspension**

On March 10, 2010, Defendant held a due process hearing to allow Plaintiff to respond to the allegation that she had pinched J.M. and made her cry.  On March 30, 2010, after hearing Plaintiff's response to the allegations, Defendant retroactively placed Plaintiff on four days of administrative leave without pay.  In a letter to Plaintiff announcing the suspension, APS Instructional Manager Cindy Soo Hoo acknowledged that Plaintiff admitted only to applying pressure to J.M.'s leg "in an attempt to relieve tension and alleviate pain from [J.M.'s] medical condition," but noted that "APS has a policy prohibiting workplace violence. . . . You are directed to never grab, hit, push or chase students in any manner."[2]  (Doc. 37 Ex. G).

---

[2]The suspension letter also cites Plaintiff's "making referrals without holding IEP meetings" as another reason supporting suspension.  Because Defendant does not cite this alleged practice as a reason for its failure to renew her employment contract, the Court will not consider it as such.  *See, e.g.,* Doc. 44 at 1 (Defendant noting that the central issue in this case "is whether a school district employer may choose to deny re-employment of a non-tenured employee based upon information that 1) she was abrasive, condescending, and generally difficult to work with; and 2) physically touched a student in a manner that caused the student to cry.").

**Notice of Re-Employment for 2010-2011 School Year**

In an undated letter (on a date not set forth in the record), APS wrote to Plaintiff announcing its intention to re-employ her for the upcoming 2010-2011 school year, "subject to the availability of funds and the approval of an operational budget for the fiscal year."  (Doc. 41 Ex. 8).

**Plaintiff's Transfer, Further Advocacy, and Additional Conflicts**

On April 29, 2010, Teise Reiser, Program Support Specialist for APS and Plaintiff's supervisor, wrote to Plaintiff about an email she received from Plaintiff two days previously. Reiser quoted Plaintiff as stating:

> I feel that making sure each student in APS receives a FAPE (free and appropriate education) is everyone's job; you in particular have a responsibility to make sure this is done.  When so much is neglected that even other staff who have concerns are unwilling to express them, perhaps due to failed prior attempts or fear of retribution the situation is easy to ignore.  I feel as professionals we have the responsibility to make sure we do our jobs even when they are difficult.  I will again request that you attend [redacted's] IEP meeting and help provide him with a reasonable program and a fair education.

Resier's response noted that she believed Plaintiff to "have good intentions, [but] I find the way in which you have chosen to communicate . . . to be offensive and blaming," which she would "not . . . tolerate as your supervisor."  (Doc. 37 Ex. H).

**Notice of Non-Renewal**

Also on April 29, 2010, Defendant issued Plaintiff a letter constituting official notice that her employment contract would not be renewed for the upcoming school year.  The letter gave "misconduct" as the reason for the non-renewal, but provided no additional explanation.  (Doc. 37 Ex. J).  Plaintiff was further advised of her right to request a meeting with the APS Superintendent or his designee regarding the decision.

**Positive Progress Statement**

On Plaintiff's May 5, 2010 Progress Statement, Reiser noted that the Principals of the schools to which Plaintiff had been transferred reported that Plaintiff is "always at her therapies," "is working well with the students," and "has a gentle nature and voice[,] yet firm approach with students."  (Doc. 37 Ex. F).  Reiser concluded that Plaintiff "is very aware of student needs and needs support to understand [the] best ways to get things accomplished and communicated."  *Id.*  Reiser recommended Plaintiff for re-employment for the upcoming school year.  (Doc. 41 Ex. 11).

**Petition for Reconsideration Denied**

On May 25, 2010, Plaintiff and an Albuquerque Teachers Federation representative met with Deborah Duncan, Director for the APS Department of Special Education, about the alleged misconduct underlying Defendant's decision not to rehire her for the 2010-2011 school year, and Plaintiff gave her side of the alleged misconduct.

On May 27, 2010, Patricia Chavez, a Program Support Specialist for APS, sent a letter to Duncan regarding Plaintiff, in which she described a series of complaints Plaintiff had made about Chavez' performance with respect to her disabled students.  Chavez recounted Plaintiff's complaining that a student "was not receiving appropriate special education services and making allegations that the school administration and APS was [sic] violating the student's right to FAPE," followed by "a second nasty email implying that I was not meeting my responsibility to insure this student was being properly served."  (Doc. 37 Ex. I).  Chavez described how Plaintiff openly disagreed with an IEP team decision not to place the student in an autism-specific program, "voiced some strong complaints about a teacher and educational assistants," and had to be reminded to "refrain from making inflammatory statements toward[s] the school and to please

keep her comments and discussion to her area of expertise, occupational therapy." *Id.*

On June 2, 2010, Duncan wrote to Plaintiff advising her that, following their meeting, she had conducted further research into the circumstances surrounding the non-renewal of Plaintiff's contract with APS, and had decided to uphold the decision.  Duncan cited as reasons for her decision Plaintiff's "engaging in behavior which creates discord and lack of harmony" and "employee misconduct regarding pinching students."  (Doc. 37 Ex. K).  On June 22, 2010, Plaintiff wrote to Winston Brooks, APS Superintendent, seeking reconsideration of the decision, in light of Plaintiff's -- in her own words -- having "essentially disproved all charges" relating to the J.M. incident and recently received a "positive employee evaluation with a recommendation for rehire."  (Doc. 37 Ex. M).  Plaintiff's request was subsequently denied.

## LEGAL STANDARD

### Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be rendered "where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th Cir. 2006); *see also* Fed. R Civ. P. 56(c)(2).  The moving party bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation and marks omitted).  Once this burden has been met, "the burden shifts to the nonmoving party to show that there is a genuine issue of material fact.  The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.  See also Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir. 1993).  It is not enough for the

nonmoving party to "rest on mere allegations or denials of his pleadings" to avoid summary

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also West v. New*

*Mexico Taxation and Rev. Dept.*, No. Civ. 09-0631, U.S. Dist. LEXIS 131626, at *42 (D.N.M.,

Oct. 31, 2010) ("[n]or can a party avoid summary judgment by repeating conclusory opinions,

allegations unsupported by specific facts, or speculation") (internal quotation and marks

omitted). In reviewing a motion for summary judgment, the court must "examine the factual

record and draw reasonable inferences therefrom in the light most favorable to the nonmoving

party." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10th Cir.

2010). Its function at this stage is "not . . . to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 243.


## DISCUSSION

### I. Impact of Plaintiff's Non-Tenured Status on Her Retaliation Claims

As an initial matter, the parties dispute the potential impact of the New Mexico School

Personnel Act on this case. Under New Mexico law, a school board "may terminate an

employee with fewer than three years of consecutive service for any reason it deems sufficient."

NMSA 1978 § 22-10A-24. The Act further states that an employer with fewer than three years

of consecutive service "has no legitimate objective expectancy of reemployment, and no contract

entered into pursuant to this section shall be construed as an implied promise of continued

employment pursuant to a subsequent contract." *Id.*, § 22-10A-21(E). Plaintiff interprets the

phrase "no legitimate objective expectancy of reemployment" to "specifically exclude its

opposite: *'subjective'* expectancy of employment." (Doc. 41 at 2) (emphasis added). Thus,

Plaintiff suggests that because she had a subjective expectancy of continued employment at

APS, her one-year contract contained an implied promise of continued employment that was breached by Defendant.

Plaintiff's interpretation is clearly erroneous.  "Under the plain meaning rule, when a statute's language is clear and unambiguous, [the court] will give effect to the language and refrain from further statutory interpretation. We will not read into a statute language which is not there, especially when it makes sense as it is written."  *State v. Hubble,* 146 N.M. 70, 75 (N.M. 2009) (internal quotation marks and citation omitted).  The Court agrees with Defendant that, under Plaintiff's logic, no non-tenured New Mexico public school employee who holds the personal belief that she should and will remain employed could ever be terminated.  Thus, the Court finds that the statute means what it says – that an employee with fewer than three years' experience can be terminated at-will, and thus has no objective basis from which to conclude that her yearly contract will be renewed.

The Court agrees with Plaintiff, however, that the Personnel Act does not insulate an employer from liability for terminating a non-tenured school employee for illegal reasons, including in retaliation for engaging in a protected activity.  "If federally instituted anti-discrimination programs . . .  could be circumvented by reliance on state statutes which limit the expectation of continued employment, employers who are protected by such state statutes would not be held accountable for their acts found to be discriminatory under federal law." *Keller v. Bd. of Educ. of the City of Albuquerque,* 182 F.Supp.2d 1148, 1162 (D.N.M. 2001). Accordingly, the Court finds that the relevant sections of the Personnel Act do not preclude Defendant from liability for retaliation.

## II.  Plaintiff's Section 504 Retaliation Claim

### A.  The Applicable Standard: the *McDonnell Douglas* Test

"The standard for retaliation claims under the Rehabilitation Act is the same as the standard for retaliation claims under the Americans with Disabilities Act (ADA)."  *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010).  In the absence of any direct evidence of retaliation, Plaintiff can carry her summary judgment burden by presenting circumstantial evidence creating an inference of discriminatory intent, using the three-part burden-shifting framework employed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Under the *McDonnell Douglas* analysis, if a plaintiff employee (1) establishes a prima facie case of discrimination, then (2) the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for having made adverse employment decisions regarding the plaintiff.  If the defendant meets its burden, all presumptions of discrimination are dropped, and (3) the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proferred reasons for the allegedly discriminatory actions are merely a pretext for discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-805 (1973); *see also Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

### B.  Plaintiff's Prima Facie Case

As noted above, in order to satisfy the first prong of the *McDonnell Douglas* analysis, Plaintiff must be able to establish a prima facie case of retaliation.  Plaintiff can meet her burden by showing (1) that she engaged in protected activity; (2) that she suffered a materially adverse action by APS either after or contemporaneous with her protected activity; and (3) that a causal connection exists between the protected activity and the adverse action. *See Reinhardt*, 595 F.3d at 1131.

**1.** *Protected Activity*

For purposes of the instant motion only, Defendant does not contest that Plaintiff's advocacy on behalf of disabled students within the schools she served at APS constitutes a protected activity under § 504 of the Rehabilitation Act.

**2.** *Materially Adverse Employment Action*

Plaintiff proffers only one materially adverse action that Defendant allegedly caused her to suffer – the non-renewal of her employment contract – which the Court agrees constitutes an obvious significant change on her employment status, and consequently, a qualifying adverse action. *See Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005) ("[a]n adverse employment action includes acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") (internal quotation omitted).   The Court will not comb through the factual allegations in an attempt to set forth other possible adverse employment actions that may have been suffered by Plaintiff, and analyze them on her behalf.

**3.** *Causal Connection*

A causal connection between a plaintiff's engaging in a protected activity and subsequent suffering of an adverse employment action may be established by producing "evidence of circumstances that justify an inference of retaliatory motive," such as where the adverse action "closely follow[s]" the protected activity.  *Haynes v. Level 3 Commc'ns, LLC,* 456 F.3d 1215, 1228 (10th Cir. 2006) (quotation marks and citation omitted).  Here, the record shows that Plaintiff complained throughout the 2009-2010 school year about what she perceived as inadequate IEPs for disabled students and her colleagues' perceived failure to meet disabled

12

students' right to a free and appropriate education.   Indeed, the record shows that APS issued its notice of non-renewal of Plaintiff's employment contract just two days after her e-mail to Reiser criticizing Reiser's alleged inaction with respect to a student.  Accordingly, the Court finds that Plaintiff has met her burden of showing a causal connection between her advocacy and the non-renewal of her employment contract.  *See Reinhardt,* 595 F.3d at 1134 (causal connection requirement met where it was undisputed that ex-APS employee "continuously complained about inaccurate caseload lists" and  "advocated for [disabled student] through the 2003-2004 school year").

**C.  Defendant's Legitimate, Nondiscriminatory Reasons for the Adverse Employment Action and Plaintiff's Showing of Pretext**

Defendant proffers two facially nondiscriminatory reasons for failing to renew Plaintiff's employment contract: first, that Plaintiff's conduct toward her colleagues justified the action, on the argument that "being an advocate does not authorize an employee to belittle coworkers, refuse to follow procedures, or otherwise create discord in the workplace," (Doc. 37 at 11); and second, that Plaintiff pinched the student J.M. and caused her to cry.  To defeat the instant motion, Plaintiff must set forth evidence from which a reasonable jury "could conclude that [Defendant's] allegedly nondiscriminatory reasons for the employment decision are pretextual." *Reinhardt,* 595 F.3d at 1134; *see also Pinkerton v. Colo. Dept. of Transp*., 563 F.3d 1052, 1065 (10th Cir. 2009) ("to establish a genuine issue as to pretext, [plaintiff] must demonstrate that [defendant's] proffered non-discriminatory reason is unworthy of belief") (quotation omitted). Plaintiff "can meet this standard by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered non-discriminatory reasons for the non-renewal "that a reasonable factfinder could rationally find them unworthy of

credence and hence infer that [Defendant] did not act for the asserted non-discriminatory

reasons." *Pinkerton,* 563 F.3d at 1065 (internal quotation marks and further citations omitted).

First, Defendant contends that its adverse employment action was justified by Plaintiff's

tendency to belittle colleagues and create discord in the workplace.  The Court finds, however,

that Plaintiff has proffered sufficient evidence from which a reasonable jury could determine that

Defendant's stated reason is merely a pretext for its decision to rid itself of an activist employee

who continually drew attention to what she perceived as APS' failure to supply disabled students

with an appropriate education. *See, e.g.,* Doc. 37 Ex. A (Robert Warr complaining that Plaintiff

re-wrote his IEPs and made his Educational Assistants "feel like [they did] not know what [they

were] doing"); *id.* (Stephanie Johnson citing Plaintiff's insistence on reviewing a report as the

basis for her complaint about Plaintiff); Doc. 37 Ex. D (Investigation Report by APS police

noting colleagues' complaints that Plaintiff was "improperly involving herself in school matters

that were none of her concern" by inserting a comment in an IEP that a student needed computer

access); Doc. 37 Ex. I (Patricia Chavez noting a series of complaints Plaintiff had made about

Chavez and describing how Plaintiff had to be reminded to "refrain from making inflammatory

statements toward[s] the school").  The Court concludes that Plaintiff has set forth sufficient

evidence from which a jury could determine that Defendant declined to renew her contract

because of the specific concerns she raised and complaints she vocalized about Defendant's non-

compliance with federal standards and its failures regarding disabled students – not because of

her manner in delivering those concerns and complaints.

Second, with regard to the allegation that Plaintiff's contract was not renewed in light of

her alleged pinching of J.M., the APS Investigation Report notes that Plaintiff explained "that

part of her duties as an occupational therapist includes the use of therapeutic techniques used to

14

relieve muscle spasms in students." (Doc. 37 Ex. D).  This explanation was supported by Rachel

Gorum, a physical therapist at Atrisco Elementary, who informed the APS Investigator that she

had witnessed Plaintiff applying pressure techniques to a student and that Plaintiff "was not

being malicious but was rather trying to relieve muscle constriction the child was experiencing."

(Doc. 41 Ex. 5).  Moreover, there is evidence in the record that Plaintiff was recommended for

re-hire even after serving a suspension for the incident.  Accordingly, the Court finds that a jury

could believe that Defendant's proffering of the J.M. incident as a basis for not renewing

Plaintiff's contract is unworthy of belief and a pretext for retaliation.

Thus, without expressing an opinion on the merits of her case, the Court finds that

Plaintiff has offered sufficient evidence of pretext to withstand summary judgment on her §504

retaliation claim.


**III.  Plaintiff's Claim Under the New Mexico Whistleblower Protection Act**

The New Mexico Whistleblower Protection Act provides that a "public employer shall

not take any retaliatory action against a public employee" where the employee, *inter alia,*

"communicates to the public employer or a third party information about an action or a failure to

act that the public employee believes in good faith constitutes an unlawful or improper act" or

"objects to or refuses to participate in an activity, policy or practice that constitutes an unlawful

or improper act."  NMSA § 10-16C-3  (2012).  A "retaliatory action" for purposes of the

Whistleblower Protection Act means "taking any discriminatory or <u>adverse employment action</u>

against  a public employee in the terms and conditions of public employment."  *Id.* at §

10-16C-2(D) (emphasis added).  An "unlawful or improper act" means a practice, procedure,

action or failure to act on the part of a public employer that, *inter alia,* "violates a federal or state

15

law, regulation, or administrative  rule" or " constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public.  *Id.* at § 10-16C-2(E). Accordingly, because the standard for making a retaliation claim under the Whistleblower Protection Act essentially mirrors the standard for establishing retaliation under §504 of the Rehabilitation Act, the Court finds that summary judgment should be denied on Plaintiff's state-law retaliation claim for the same reasons as set forth above in relation to Plaintiff's federal claim.

<u>**CONCLUSION**</u>

**IT IS THEREFORE ORDERED** that Defendant's *Motion for Summary Judgment* (Doc. 37) is denied.

**UNITED STATES DISTRICT JUDGE**